Eric **CROFT**, a private individual, and Alaskans for Clean Elections, an initiative group, and Tim June, Steve Cleary, and Joe McKinnon, initiative sponsors, Appellants,

v.

Sean **PARNELL**, Lieutenant Governor of the State of Alaska, and the State of Alaska, Appellees.

No. S–13200.

Supreme Court of Alaska.

July 9, 2010.

Eric Croft, Law Offices of Eric Croft, Joseph H. McKinnon, Law Offices of Joseph H. McKinnon, Anchorage, for Appellants.

Michael A. Barnhill, Senior Assistant Attorney General, Richard A. Svobodny, Acting Attorney General, Juneau, for Appellees.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, WINFREE, and CHRISTEN, Justices.

## OPINION

CHRISTEN, Justice.

## I. INTRODUCTION

Sponsors of an initiative challenge the lieutenant governor's refusal to certify the initiative for the ballot. The lieutenant governor denied certification because he determined that the initiative violated the single-subject requirement of AS 15.45.040. The sponsors filed suit in the superior court seeking a declaration that the initiative did not violate the single-subject rule. The superior court granted summary judgment in favor of the lieutenant governor and the sponsors appeal. Because the "soft dedication" of funds connecting the two aspects of the initiative is an insufficient link, and because we find no other sufficient connection between the initiative's proposed new oil production tax and the initiative's proposed new "clean elections" program, we agree that the initiative violates the single-subject rule. Accordingly, we affirm the superior court's order entering summary judgment in favor of the lieutenant governor.

## II. FACTS AND PROCEEDINGS

On May 29, 2007, Tim June, Steve Cleary, and Joe McKinnon submitted an application for a ballot initiative to Lieutenant Governor Sean Parnell.[1] The initiative proposed a pro-

---

1. The initiative was titled "An Act establishing a program of public funding for campaigns for

gram to provide public campaign funding to candidates for state office on a voluntary, opt-in basis. The initiative also proposed a three-cent tax on each barrel of oil produced in Alaska and stated that "[t]he legislature may appropriate ... the proceeds" of the tax to fund the program. The proposal included a non-binding directive that the legislature transfer excess funds to the Permanent Fund Dividend.

After submitting the initiative application, the sponsors engaged in "informal communications" with the Department of Law that led the sponsors to file a second initiative application. This second initiative application proposed the public campaign funding program but not the additional tax on oil production.

Lieutenant Governor Parnell reviewed the applications as required by AS 15.45.070. This statute directs the lieutenant governor to either certify an application for placement on the ballot or explain why certification is denied.[2] Lieutenant Governor Parnell denied certification of the first initiative proposal, explaining that the initiative "violates the single-subject rule" because "the initiative addresses two subjects that have no fair relation to each other: (1) it creates a voluntary system of public campaign financing, and (2) it imposes a tax on oil production."

Lieutenant Governor Parnell approved the second version of the initiative application. It appeared on the August 2008 ballot but did not pass.

The initiatives' sponsors, Eric Croft and a group called Alaskans for Clean Elections (collectively, "the Sponsors"), filed a complaint in the superior court against Lieutenant Governor Parnell and the State of Alaska (collectively, "Lieutenant Governor") seeking a declaration that the Lieutenant Governor erroneously rejected the first initiative.

The superior court granted summary judgment in favor of the Lieutenant Governor in June 2008. The Sponsors appeal.

### III. STANDARD OF REVIEW

 When reviewing a grant of summary judgment, we apply our independent judgment, "affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law."[3] In determining whether the prevailing party was entitled to judgment as a matter of law, we "draw [ ] all factual inferences in favor of, and view [ ] the facts in the light most favorable to, the non-prevailing party."[4]

 We interpret the Alaska Constitution using our independent judgment, "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[5]

### IV. DISCUSSION

The parties agree that the only issue in this case is whether the Sponsors' initiative violates the Alaska Constitution's single-subject rule.[6] Article II, section 13 of the Alas-

state elected offices, to be known as the Alaska Clean Elections Act, and amending the oil and gas production tax to levy and collect a surcharge on oil as a source of funding for that program."

2. AS 15.45.070 provides: "Within 60 calendar days after the date the application is received, the lieutenant governor shall review the application and shall either certify it or notify the initiative committee of the grounds for denial."

3. *Beegan v. State, Dep't of Transp. & Pub. Facilities*, 195 P.3d 134, 138 (Alaska 2008) (citing *Matanuska Elec. Ass'n v. Chugach Elec. Ass'n*, 152 P.3d 460, 465 (Alaska 2007)).

4. *State v. Jeffery*, 170 P.3d 226, 229 (Alaska 2007) (citing *Lewis v. State, Dep't of Corr.*, 139 P.3d 1266, 1268–69 (Alaska 2006)).

5. *Id.* at 230 (quoting *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999) (internal quotation marks omitted)).

6. The Sponsors' application was rejected for violating the single-subject provision of AS 15.45.040. Neither party argues that this rule differs from restrictions imposed by article II, section 13 of the Alaska Constitution, which requires that every bill may have only one subject. We have previously explained that, regardless of AS 15.45.040, "the [a]rticle II restriction ... applies to initiatives" under article XII, section 11, which provides that the people may exercise the legislature's law-making powers through the initiative. *Yute Air Alaska Inc. v. McAlpine*, 698 P.2d 1173, 1179 n. 2 (Alaska 1985).

ka Constitution provides, in part, that "[e]very bill shall be confined to one subject." Our court has ruled on challenges to bills and initiatives under this provision in only seven cases.[7] In each case, we identified a single subject that encompassed all the provisions of the challenged bill or initiative; that is, every provision of the bill or initiative, considered on its own, related to a broader, single subject.[8]

Despite their contrary outcomes, the superior court relied on these cases and ruled in favor of the Lieutenant Governor, explaining that "there is [no] connection between the type of revenue created ... [and] the type of program" proposed by the initiative. On appeal, the Sponsors argue that the trial court improperly interpreted the single-subject rule to require a nexus between a funding source and the funded program beyond the fact of the funding. The Sponsors argue that even when two provisions of a bill are not otherwise related by subject, if one provision creates a program and another imposes a tax calibrated to collect approximately the amount of revenue necessary to fund the program, a non-binding, "soft dedication" of funds from the revenue source is sufficient to unite what would otherwise be two subjects into one, at least for purposes of the single-subject test. The Sponsors also argue, in the alternative, that the initiative's oil tax *is* thematically related to the campaign finance program. We are not persuaded by either of these arguments.

■ The single-subject rule protects the voters' ability to effectively exercise their right to vote by requiring that different proposals be voted on separately. This approach allows voters to express their will through their votes more precisely, prevents the adoption of policies through stealth or fraud,[9] and prevents the passage of measures lacking popular support by means of log-rolling.[10]

■ In ruling on single-subject challenges, we must balance the rule's purpose against the need for efficiency in the legislative process. If the rule were applied too narrowly, "statutes might be restricted unduly in scope and permissible subject matter, thereby multiplying and complicating the number of necessary enactment[s] and their interrelationships."[11] Our solution has been to construe the single-subject "provision ...

---

7. *See Evans ex rel. Kutch v. State*, 56 P.3d 1046 (Alaska 2002); *Yute Air*, 698 P.2d at 1173; *State v. First Nat'l Bank of Anchorage*, 660 P.2d 406 (Alaska 1982); *Short v. State*, 600 P.2d 20 (Alaska 1979); *North Slope Borough v. SOHIO Petroleum Corp.*, 585 P.2d 534 (Alaska 1978); *Gellert v. State*, 522 P.2d 1120 (Alaska 1974); *Suber v. Alaska State Bond Comm.*, 414 P.2d 546 (Alaska 1966).

8. *See Evans*, 56 P.3d at 1049, 1070 (changes to damages recoverable for torts, changes to tort statutes of limitations, change to allocation of fault between parties in tort suits, change to offer of judgment rules, and grant of partial immunity to hospitals all "within the single subject of 'civil actions' "); *Yute Air*, 698 P.2d at 1175, 1181 (repeal of regulations of "motor and air carriers in Alaska," prohibition on further similar regulation, and requirement that governor seek repeal of federal statute that, among other things, regulates shipping by sea, all embraced by "[t]he subject 'transportation' "); *First Nat'l Bank of Anchorage*, 660 P.2d at 414–15 (provisions regulating sale of private land, and provisions on state's power to lease state-owned land and zone private lands all "in some respect concern[] land"); *Short*, 600 P.2d at 22–24 & n. 2 (purposes of new correctional facilities "sufficiently

related to the purposes" of new buildings for "state troopers, fish and wildlife protection, a motor vehicles division, [and] a fire prevention division"); *SOHIO*, 585 P.2d at 545–46 (various provisions on municipal and state taxes all "relate directly to state taxation"); *Gellert*, 522 P.2d at 1123 (flood control projects and small boat harbors "all part of a cooperative water resources development program"); *Suber*, 414 P.2d at 557 & n. 23 (criminal penalty for false statements in application for earthquake relief funds "fairly incidental to the general subject ... of grants to homeowners").

9. *See Suber*, 414 P.2d at 557.

10. *Gellert*, 522 P.2d at 1122 ("Log-rolling consists of deliberately inserting in one bill several dissimilar or incongruous subjects in order to secure the necessary support for passage of the measure.").

11. *Gellert*, 522 P.2d at 1122; *see also Evans*, 56 P.3d at 1069 (quoting *State v. First Nat'l Bank of Anchorage*, 660 P.2d at 415); *Yute Air*, 698 P.2d at 1183 (Moore, J., dissenting) (citing *Gellert*, 522 P.2d at 1122); *Short*, 600 P.2d at 23 (quoting *Gellert*, 522 P.2d at 1122).

with considerable breadth." [12] We have consistently articulated the substance of the test to reflect this approach:

> All that is necessary is that [the] act should embrace some one general subject; and by this is meant, merely, that all matters treated of should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject.[13]

In applying this test, we "disregard mere verbal inaccuracies, resolve doubts in favor of validity," and strike down challenged proposals only when the violation is "substantial and plain." [14]

■ In each of the seven cases in which this court has addressed a single-subject challenge, we upheld the challenged bill or initiative by determining that all provisions related to a single general subject, theme, or purpose.[15] But we have never addressed the question, raised by the Sponsors in this case, whether creating a revenue source that might fund an otherwise unrelated program suffices to unite the revenue source with the program as a "single subject."

The Sponsors argue that the creation of a program and the "soft dedication" of funds for that program are "inherently related" provisions "as a matter of both logic and popular understanding." They argue that the Washington Supreme Court's decision in *Wash. Ass'n of Neighborhood Stores v. Wash.* supports their position.[16] *Neighborhood Stores* involved an initiative that increased taxes on cigarettes and dedicated the new revenue to existing programs in the areas of "violence reduction and drug enforcement," "health services," and "water quality," with remaining funding allocated to "low-income health care programs and other programs." [17] The court held that the initiative did not violate that state's single-subject rule [18] because the new taxes provided revenue to programs that collectively constituted "a single and rationally unified proposal for improving the health of [Washington's] low-income citizens without imposing a net loss of tax revenue on other preexisting programs." [19]

In this case, the superior court observed that neither *Neighborhood Stores* nor any other example identified by appellants addressed a single initiative that proposed the creation of an entirely new government program and also proposed the creation of a new and thematically unrelated revenue source. The *Neighborhood Stores* initiative, which created and dedicated a revenue source, is fundamentally different from the Sponsors' initiative, which proposed the creation and "soft dedication" of a new revenue source, *and* proposed the creation of an entirely new government program. The latter runs afoul of the single-subject rule because it does not provide the voters with an opportunity to express their approval or disapproval of each distinct proposal.

*Neighborhood Stores* is also distinguishable because it was decided in the context of Washington's prohibition on the dedication of funds beyond a single biennium,[20] a framework different from the proscription of

---

12. *Gellert,* 522 P.2d at 1122.

13. *Gellert,* 522 P.2d at 1123 (quoting *Johnson v. Harrison,* 47 Minn. 575, 50 N.W. 923, 924 (1891)) (internal quotation marks omitted); *see also Evans,* 56 P.3d at 1069 (quoting *First Nat'l Bank of Anchorage,* 660 P.2d at 415); *Yute Air,* 698 P.2d at 1180–81 (quoting *Gellert,* 522 P.2d at 1123); *First Nat'l Bank of Anchorage,* 660 P.2d at 415 (quoting *Gellert,* 522 P.2d at 1123); *Short,* 600 P.2d at 24 (quoting *Gellert,* 522 P.2d at 1123); *SOHIO,* 585 P.2d at 545 (quoting *Gellert,* 522 P.2d at 1123).

14. *Gellert,* 522 P.2d at 1122 (quoting *Suber,* 414 P.2d at 557); *see also Evans,* 56 P.3d at 1069 (quoting *First Nat'l Bank of Anchorage,* 660 P.2d at 415); *First Nat'l Bank of Anchorage,* 660 P.2d at 415 (quoting *SOHIO,* 585 P.2d at 545); *Short,* 600 P.2d at 23 nn. 7 & 8 (citing *SOHIO,* 585 P.2d at 545, and quoting *Suber,* 414 P.2d at 557); *SOHIO,* 585 P.2d at 545 (citing *Suber,* 414 P.2d at 557).

15. *See supra* note 8.

16. 149 Wash.2d 359, 70 P.3d 920 (2003).

17. *Id.* at 922.

18. Wash. Const. art. II, § 19.

19. *Neighborhood Stores,* 70 P.3d at 926.

20. Wash Const. art. VIII, § 4.

dedicated funds in Alaska. The Alaska Constitution expressly prohibits the binding dedication of state revenues for specific projects.[21] As the superior court correctly noted, "[t]he additional proceeds generated by the [proposed] oil production tax need not and indeed cannot be appropriate[d] to fund the Alaska Clean Elections Program" without running afoul of Article IX, section 7 of Alaska's Constitution. Because the dedication of funds is not permitted in Alaska, a "soft dedication" cannot be considered for purposes of a single-subject analysis and therefore cannot be used to make two independent provisions of an initiative address one subject. Without the "soft dedication," the Sponsors' proposed initiative will satisfy the requirements of the single-subject analysis only if its two provisions—campaign finance and taxation of the oil industry—otherwise relate to a single subject matter.

The Sponsors argue that even if the "soft dedication" of tax revenue cannot be considered, the proposed oil production tax is still related to the subject of "clean elections" because "the oil industry and the oil field services companies ... exert a tremendous and undue influence on Alaska politics and politicians," and contributions from these groups have been "fueling [electoral] campaigns in Alaska for years." But the oil industry is not the only source of contributions to political campaigns in Alaska, and the proposed tax is on oil production, not the political activities of the oil industry. The support for the Sponsors' argument—two newspaper articles and a listing of the top groups lobbying the Alaska Legislature—is insufficient to demonstrate a clear or established connection between the oil industry and a need for public financing of state electoral campaigns.

The proposed initiative directly implicates one of the main purposes of the single-subject rule—the prevention of log-rolling—in two ways. As noted earlier, the essence of log-rolling is appealing to different constituencies by including distinct provisions calculated to obtain sufficient votes to pass a measure.[22] The superior court observed that "record oil and gas prices, high oil company profits, the Exxon Valdez litigation, and controversy regarding a proposed gas pipeline" make the oil industry a target for some groups whose votes on this initiative could be driven entirely by such concerns. We agree that the events and issues cited by the superior court could influence some voters, but we note that other voters may be equally driven by strong feelings of support for the jobs and tax revenue generated by the oil industry in Alaska. Either way, coupling the approval of a new oil production tax with approval of a program to publicly fund elections deprives the voters of an opportunity to send a clear message on each subject encompassed by the Sponsors' initiative.

The second way the initiative violates the prohibition against log rolling is its inclusion of a non-binding directive that the legislature transfer funds left over from public elections to the Permanent Fund Dividend.[23] The Permanent Fund Dividend is entirely unrelated to the purpose of the clean elections program; offering the chance of increased Permanent Fund Dividend payments runs the risk of garnering support for the clean elections program from voters who are otherwise indifferent—or even unsupportive—of publicly funded campaigns.

## V. CONCLUSION

For the reasons addressed above, we AFFIRM the decision of the superior court.

**21.** Article IX, section 7 prohibits binding dedications of state revenues to specific projects. Article XI, section 7 independently prohibits initiatives from dedicating revenues.

**22.** *See supra* note 10.

**23.** This provision is part of proposed AS 15.14.010(e).